IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ISMAEL NUNEZ,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br><br>Case No. 1:10-CR-127 |

This matter is before the court on defendant's motion to suppress. (Dkt. No. 14.) On February 24, 2011, the court conducted an evidentiary hearing on the motion. J. Edward Jones represented Defendant Ismael Nunez. Richard McKelvie represented the government. Following the hearing the court set a briefing schedule. After review and consideration of the memoranda submitted by the parties, the testimony presented at the evidentiary hearing, the court enters the following memorandum decision and order.

## FACTUAL FINDINGS

The court finds the relevant facts as follows.[1] On July 15, 2010, Utah County Deputy

---

[1] Reference to the transcript of the evidentiary hearing conducted on February 24, 2011, will be cited as "Tr. at ___."

1

Sheriff Jonstan Kantor was working on I-15. (Tr. at 9-10.) Deputy Kantor's vehicle was a marked patrol vehicle, he was in uniform and his vehicle had video recording capabilities. (Tr. at 11-12.) Deputy Kantor received information from one of his sergeants that a white Toyota with out-of-state plates was traveling north on I-15. (Tr. at 13.) Deputy Kantor understood that the information he received to mean that the vehicle was of some interest to law enforcement. (Tr. at 14.) Deputy Kantor did not know exactly why the vehicle was of interest to law enforcement. (Tr. at 14.)

Shortly after speaking with his sergeant, Deputy Kantor entered the freeway. As Deputy Kantor was on the on-ramp he noticed a white Toyota with out-of-state license plates. (Tr. at 14.) The posted speed limit in the area Deputy Kantor saw the white Toyota is 75 miles per hour. (Tr. at 14.) Deputy Kantor, while following the vehicle, ran the license plate through his computer. (Tr. at 16.) The white Toyota appeared, to Deputy Kantor, to be traveling faster than the posted speed limit. (Tr. at 16.) In order to confirm that the vehicle was speeding Deputy Kantor paced the vehicle for several miles and determined that the vehicle was traveling 85 miles per hour. (Tr. at 17.)

While following the vehicle, Deputy Kantor noticed that its right tires crossed the white fog line, which separates the right lane of travel from the shoulder of the interstate. (Tr. at 18.) After observing the speed of the vehicle and the vehicle cross the fog line, Deputy Kantor activated his overhead lights. (Tr. at 19.) The driver slowed down and turned on his right turn signal, however, rather than immediately stopping he continued traveling north until he exited the freeway on the 257 off-ramp. (Tr. at 19-20.)

2

Deputy Kantor noted "a lot of movements in the vehicle, both to [the driver's] left side and his right." (Tr. at 20.) Deputy Kantor believed that the driver was possibly concealing something or reaching for something. (Tr. at 20.) Deputy Kantor believed that the driver could be arming himself with a weapon. (Tr. at 20-21.)

Sometime after the vehicle came to a stop Deputy Kantor activated his video camera, however, the audio recording device in Deputy Kantor's vehicle did not work. (Tr. at 43-44.) When Deputy Kantor approached the white Toyota he identified the driver as Ismael Nunez. (Tr. at 21.) Deputy Kantor explained the reasons for the stop and Mr. Nunez indicated that he may have been speeding and that he was not paying attention. (Tr. at 23.)

Deputy Kantor observed what he believed were signs of impairment. (Tr. at 23.) He noticed that Mr. Nunez's eyes were red and he slurred some of his words. (Tr. at 23-24.) When asked if he had consumed alcohol or drugs during the day Mr. Nunez said that he had taken a muscle relaxer prescribed by a doctor. (Tr. at 26).

When asked where he was coming from and where he was going Mr. Nunez told Deputy Kantor that he was returning home from Las Vegas. (Tr. at 25.) Mr. Nunez indicated that he had gone to Las Vegas to sell his truck and then rented a car to get back to Utah. (Tr. at 25-26.) Mr. Nunez also indicated that he was going to return to Las Vegas the next day. (Tr. at 26.)

Based on the signs Deputy Kantor observed and the bizarre activities of Mr. Nunez Deputy Kantor requested the assistance of a K-9 officer with a narcotics dog. (Tr. at 29-30.) Jason Hurst, a K-9 officer from Payson, arrived within five minutes of Deputy Kantor's request. (Tr. at 30.) After requesting the assistance of a K-9 unit Deputy Kantor investigated the

3

defendant and his suspected impairment. (Tr. at 30.) Deputy Kantor first ran a records check on Mr. Nunez and then asked Mr. Nunez to exit his vehicle to perform a field sobriety test to evaluate whether he was under the influence of drugs. (Tr. at 30.) Deputy Kantor conducted a horizontal gaze nystagmus test ("HGN Test") to determine if Mr. Nunez was impaired. (Tr. at 31.) At the conclusion of the HGN Test, Deputy Kantor determined that Mr. Nunez was not under the influence and could safely drive his vehicle. (Tr. at 47). While Deputy Kantor was administering the HGN Test Officer Hurst arrived with his dog. (Tr. at 32.) After Officer Hurst arrived, he waited approximately 30 seconds for Deputy Kantor to complete the HGN Test. (Tr. at 33.) Deputy Kantor asked Officer Hurst to conduct a canine search around the exterior of the vehicle. (Tr. at 64.) Officer Hurst's dog, Endy, is trained in the detection of marijuana, cocaine, heroine and methamphetamine. (Tr. at 57.) Endy and Officer Hurst are certified as a drug detection team by State of Utah Department of Public Safety Peace Officer Standards and Training ("POST") (Tr. at 58-59.) Endy alerted to the passenger door. (Tr. at 67.) Endy also attempted to jump into the driver's side window (Tr. at 67.) Officer Hurst, believing that drugs were in the vehicle, allowed Endy to search the interior of the vehicle. (Tr. at 70.) Once inside the vehicle Endy again alerted, this time on the floorboard between the driver's seat and the door panel. (Tr. at 70.) Officer Hurst then searched the car and found drugs in a gap between the steering column and cover. (Tr. at 36.) He also found drugs in a food bag. (Tr. at 36.)

On July 15, 2010, Mr. Nunez was charged in a one-count indictment with possession with intent to distribute fifty grams or more of Methamphetamine in violation of 21 U.S.C. §841(a)(1). Thereafter, Mr. Nunez moved to suppress all evidence seized or statements obtained

as a result of the traffic stop because "it was obtained in violation of his constitutional rights espoused in the Fourth and Fifth Amendments to the United States Constitution." (Dkt. No. 14.)

## DISCUSSION

The Fourth Amendment to the United States Constitution protects citizens form unreasonable searches and seizures by government actors. *See* U.S. Const. Amend. IV; *United States v. Sanchez*, 89 F.3d 715, 717 (10th Cir. 1996). "[T]he decision to stop an automobile is reasonable," and consistent with the Fourth Amendment, "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).

### A.     The Initial Stop of Mr. Ismael Nunez

A traffic stop is justified at its inception if "the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). "Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction. *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

In this case, Deputy Kantor stopped Mr. Nunez's vehicle based on two separate traffic violations, speeding and failure to remain in the lane of travel. *See* Utah Code Ann. §§ 41-6a-601, 41-6a-710 (2010).

Deputy Kantor testified "when I first observed the vehicle and I finally caught up to the vehicle, it appeared to be going faster than the posted speed limit." (Tr. at 16.) Deputy Kantor

also paced Mr. Nunez's vehicle and based on his pacing Mr. Nunez was going 85 miles per hour. (Tr. at 17.) Mr. Nunez testified that he had set the cruise control at 63 miles per hour, 12 miles per hour below the posted speed limit. (Tr. at 79.) Because of the conflicting testimony and the fact that Deputy Kantor had received information about a white Toyota, Mr. Nunez claims that Deputy Kantor did not have cause to stop Mr. Nunez's vehicle based on a speeding violation.

The fact that Mr. Nunez testified that he had the cruise control set at 63 miles per hour at the time of the stop is irrelevant so long as Deputy Kantor had reasonable suspicion that Mr. Nunez was speeding. *See United States v. Vercher*, 358 F.3d 1257, 1262-63 (10th Cir. 2004). The court finds Deputy Kantor's testimony to be credible. Based on his visual estimate and pacing of Mr. Nunez's vehicle, Deputy Kantor had reasonable suspicion to stop Mr. Nunez.

While Deputy Kantor was following Mr. Nunez he noticed that the passenger side tires crossed over the white fog line which is a violation of Utah law. *See* Utah Code Ann. § 41-6a-710 (2010). Mr. Nunez claims that crossing the fog line does not give officers grounds to pull over a vehicle. *See State v. Morris*, 2009 UT App 181. However, in *Morris* the driver bumped the fog line, rather than crossed the fog line. *Id.* Also the driver in *Morris* provided a plausible explanation for bumping the fog line. Mr. Nunez provided no such explanation in this case. The Tenth Circuit Court of Appeals has also addressed the validity of traffic stops involving failure to remain in the lane of travel. *United States v. Vercher*, 358 F.3d 1257, 1262 (10th Cir. 2004). "One incident of straying onto the shoulder of a road did not establish reasonable suspicion of criminal activity when the road was winding, the terrain mountainous and the weather windy."

*Id*. There is nothing in this case to indicate "the road was winding, the terrain mountainous or the weather windy" which could explain why Mr. Nunez crossed the fog line.

In this case the court finds that Deputy Kantor's observations of Mr. Nunez speeding and crossing the fog line provided reasonable suspicion to stop Mr. Nunez's vehicle.

### B. The Scope of the Detention

Having determined that the traffic stop was justified at its inception, the court must ask "whether the officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). The Supreme Court has made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). With regard to permissible conduct during a traffic stop, the Tenth Circuit Court of Appeals has established that the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. *United States v. Walker*, 933 F.2d 812, 816 (10th Cir. 1991); *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990), *cert. denied*, 501 U.S. 1207 (1991). "If the driver produces a valid license and proof of right to operate the vehicle, the officer must allow him to continue on his way without delay for further questioning." *Pena*, 920 F.2d at 1514. However, an officer may detain a driver for further questioning unrelated to the initial stop if the officer develops a reasonable and articulable suspicion that the driver has engaged or is engaging in illegal activity or if the initial detention has become a consensual encounter. *Untied States v. Hunnicutt*, 135 F.3d 1345, 1349

7

(10th Cir. 1998).

Mr. Nunez asserts that Deputy Kantor unlawfully extended the stop in order for Officer Hurst to search the vehicle. The video from the traffic stop shows Officer Hurst and Endy conducting an exterior search after Deputy Kantor completed the HGN test. However, Deputy Kantor testified that after conducting the HGN test he briefly spoke to Officer Hurst and then continued his investigation by asking Mr. Nunez additional questions. Deputy Kantor testified that his investigation was not extended because of the presence of Officer Hurst and Endy. (Tr. at 34.) An exterior search of Mr. Nunez's vehicle while he was lawfully detained for a traffic violation "does not rise to the level of a constitutionally cognizable infringement." *Illinois v. Caballes* 543 U.S. 405, 409 (2005). Mr. Nunez argues that once Deputy Kantor finished the HGN test he should have let Mr. Nunez go. However, Deputy Kantor was in the midst of investigating Mr. Nunez for possible impairment. (Tr. at 33-34.)

Even if Deputy Kantor's investigation of the initial stop had concluded he had reasonable suspicion to believe criminal activity may be afoot. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In deciding whether the standard is met the court looks to the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Four considerations, taken together lead the court to find that the reasonable suspicion standard is satisfied here.

First, Mr. Nunez did not stop immediately after Deputy Kantor signaled him to pull over. Instead, he braked which slowed his car considerably and signaled to the right. Rather than pulling over Mr. Nunez continued traveling north and eventually exited the interstate and stopped

8

on the off-ramp. (Tr. at 19-20.) During the time that it took Mr. Nunez to eventually stop his vehicle Deputy Kantor noticed "movements in the vehicle, both to his left side and right." (Tr. at 20.) Deputy Kantor believed that Mr. Nunez was "possibly concealing something." (Tr. at 20.) The Tenth Circuit Court of Appeals has repeatedly held that a driver's failure to stop his vehicle promptly is a factor that can contribute to reasonable suspicion of criminal activity. *See United States v. Villa-Chaparro*, 115 F.3d 797, 799, 802 (10th Cir. 1997); *United States v. Elkins*, 70 F.3d 81,83 (10th Cir. 1995); *United States v. Walraven*, 892 F.2d 972, 973, 975(10th Cir. 1989). Given the fact that Mr. Nunez did not promptly stop his car adds to the reasonable suspicion analysis.

Second, Mr. Nunez's account of his travel was suspect. He claimed that he drove his truck to Las Vegas and sold it. He then indicated that he rented a car to drive back to his home in West Jordan, Utah. He also told Deputy Kantor that he was planning on returning to Las Vegas the next day and provided no explanation for the return trip. (Tr. at 25-26.) Deputy Kantor stated "in speaking with Mr. Nunez concerning his activities for the day, seemed to indicate to me a possible narcotics trafficking or drug activity." (Tr. at 29.) Bizarre travel plans may, by themselves, contribute to reasonable suspicion that criminal activity is occurring. *See United States v. White*, 584 F.3d 935, 943, 951 (10th Cir. 2009); *United States v. Sokolow*, 490 U.S. 1, 9, 109 S,Ct, 1581, 104 L.Ed.2d 1 (1989). Considering Mr. Nunez's strange travel plans the court finds that Deputy Kantor reasonably suspected Mr. Nunez's travel plans were not as he claimed them to be. Again this is a factor that adds to the reasonable suspicion analysis

Third, Deputy Kantor testified that Mr. Nunez was nervous during the encounter. It is, of

9

course, not surprising that Mr. Nunez was nervous. Most people are nervous when pulled over by the police. Because most people get nervous when pulled over, the Tenth Circuit Court of Appeals has repeatedly emphasized that "nervousness is of limited significance in determining reasonable suspicion." *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997) (quoting *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994)). However, the Tenth Circuit has held that just because we all get nervous does not mean that the court should ignore evidence of prolonged nervousness. *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001).

In this case, Deputy Kantor testified "as you watch the video, he makes a lot of nervous movements as I'm talking to him." (Tr. at 45.) Deputy Kantor testified that it took approximately 20 minutes between the time of the stop and Endy alerting on the car. (Tr. at 37.) After about six minutes of the video Endy alerts on the car. *See* Gov't Ex. 2. Therefore Mr. Nunez had been stopped for at least ten minutes before Deputy Kantor activated the camera and had Mr. Nunez exit his vehicle. After at least ten minutes Deputy Kantor still noticed nervous movements from Mr. Nunez. The court notes that Mr. Nunez's nervousness is of limited significance. However, when looking at the totality of the circumstances the court cannot ignore Mr. Nunez's prolonged nervousness. The fact that Mr. Nunez was still nervous after ten minutes can be used as a minor factor in helping to determine if there was reasonable suspicion that criminal activity was occurring.

Fourth, Mr. Nunez drove a car that was not registered to him. This is a factor that may indicate drug trafficking. *United States v. Olivares-Campos*, 276 F. App'x 816, 821 (10th Cir. 2008) (unpublished); *see also United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991). Even

10

though Mr. Nunez had an explanation for driving a rental car, the fact that the car was not registered to him is enough to be relevant to the reasonable suspicion analysis. *Turner*, 928 F.2d at 959.

Considering the four factors above, the court finds that a particularized and objective basis existed for suspecting Mr. Nunez of drug trafficking. Therefore, the officers had reasonable suspicion to believe criminal activity may be afoot. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Having determined that the stop was justified at its inception and that there was reasonable suspicion that criminal activity may be afoot, the question remains whether there was probable cause to allow for a search of Mr. Nunez's car consistent with the Fourth Amendment. Generally, a positive alert by a certified drug dog is enough, by itself to give officers probable cause to search a vehicle. *See United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009). Once Endy alerted on the car, Officer Host had probable cause to conduct a search of the vehicle. *See United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993).

Mr. Nunez claims that Endy was not reliable because in the past year Endy has given 20 false positives out of roughly 100 searches. (Tr. at 77.) According to the testimony at the hearing Endy's alerts have identified drugs 80% of the time. However, rather than relying on statistics the court will look to the dog's certification. *See United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) ("[W]ith a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill.") (quotation omitted). "More than percentages, precedent and common sense rules (like reliance on certification processes)

11

ought to inform the probable cause analysis." 2011 WL 1533520 (C.A. (Wyo.))

In this case Endy was POST certified. (Gov't Ex. 1.) The court finds, based on the POST certification, that Endy's alert on the car led to probable cause to search Mr. Nunez's vehicle.

## CONCLUSION

For the reasons discussed above, it is hereby ordered that the defendant's motion to suppress is DENIED.

DATED this 9ᵗʰ day of June, 2011.

David Sam
United States District Judge